UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CANDY LYNCH                              CIVIL ACTION NO.  6:22-CV-02059

VERSUS                                  JUDGE ROBERT R. SUMMERHAYS

COMMISSIONER OF SOCIAL                  MAGISTRATE JUDGE DAVID J. AYO
SECURITY ADMINISTRATION


**REPORT AND RECOMMENDATION**

Before the Court is an appeal by Claimant Candy Lynch of the Commissioner's finding of non-disability.  The Court has considered the administrative record, the parties' briefs, and the applicable law, and recommends that the Commissioner's decision be vacated and remanded to the Commissioner for further proceedings consistent with the views expressed herein.

**Administrative Proceedings**

Claimant fully exhausted her administrative remedies before filing this action. She filed an application for disability insurance benefits and supplemental security income on August 14, 2018,[1] alleging disability beginning on October 8, 2016.  (Rec. Doc. 6-1, pp. 280, 285).  Her application was denied on December 13, 2018. (Rec. Doc. 6-1, pp. 126, 130).  She filed a request for a hearing on December 31, 2018 (Rec. Doc. 6-1, pp. 133, 135), which was held by telephone due to the "extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) pandemic" before

---

[1] The ALJ stated that the applications were filed on July 19, 2018.  The record does not contain an application dated July 19, 2018.  She filed the instant application and an earlier application dated November 14, 2016, which was denied on July 27, 2017. (Rec. Doc. 6-1, pp. 66, 275, 277, 282).

Administrative Law Judge Devona Able on August 2, 2021.[2] (Rec. Doc. 6-1, p. 44 *et seq*). The ALJ issued a decision on September 22, 2021, concluding that Claimant was not disabled within the meaning of the Social Security Act from the claimed disability onset date of October 8, 2016, through the date of the decision. (Rec. Doc. 6-1, pp. 26-34). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeals Council found no basis for review. (Rec. Doc. 6-1, p. 8). Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

### Summary of Pertinent Facts

Claimant was born on September 11, 1972. She was 44 years old on the alleged disability onset date and 49 years old at the time of the ALJ's decision. She has a GED, and her work history includes employment as a cook, crew member and waitress in the food industry. (Rec. Doc. 355). She alleged that she has been disabled since October 8, 2016, due to arthritis, spine surgery on November 25, 2016, neck surgery on February 17, 2009, high blood pressure and COPD emphysema. (Rec. Doc. 6-1, p. 337).

The record reveals the following pertinent history:

### I.    Claimant's Medical Records

### A.    Dr. Patrick Juneau, Neurosurgeon, Lafayette, Louisiana

---

[2] Claimant requested an in-person hearing on December 31, 2018, which was originally set for March 20, 2020, and moved to June 23, 2020. by phone due to the pandemic. When she learned that the hearing would be conducted by phone, Claimant requested that the hearing be postponed until it could be held in person. After being informed in April of 2021 that the hearings were still being conducted by phone, Claimant agreed to attending by phone. (Rec. Docs. 6-1, pp. 187-205).

- Surgery, February 18, 2009 – Following a motor vehicle accident which resulted in neck and left arm pain and an MRI which showed a large, herniated disc at the C5/6 level compressing the left side of the spinal cord and the left C6 nerve root, Dr. Juneau performed an anterior cervical diskectomy with instrumented fusion at C5/6. (Rec. Doc 6-1, pp. 848-851).
- Follow-up office visits –
  On March 2, 2009, Dr. Juneau noted that left arm pain and numbness had dramatically improved, but that she had radiating residual pain in the neck. He prescribed a Medrol dose pack. (Rec. Doc. 6-1, p. 843).
  On April 30, 2009, Dr. Juneau noted that her radicular pain had resolved but noted residual neck pain. He refilled her prescription for Lortab and prescribed Soma. (Rec. Doc. 6-1, p. 842).
  On January 18, 2010, Dr. Juneau discharged her to see him only on an as needed basis. (Rec. Doc. 6-1, p. 841).

B.  David Greenaway, PhD Clinical Psychologist, Lafayette, La.

On July 21, 2011, Dr. Greenway evaluated Claimant on referral from Disability Determination Services (from a prior claim) and provided a Psychological Report. Claimant reported seeing Dr. Kortum in Lafayette for anxiety and pain management and that she was on Xanax, Lortab, Soma, and Lisinopril. Dr. Greenaway stated that she was of normal weight, diagnosed her with moderate agoraphobia with panic disorder related to trauma, and stated that she "would not be able to tolerate normal stress associated with day-to-day work activity and demands." (Rec. Doc. 6-1, pp. 464-466).

C.  Our Lady of Lourdes Regional Medical Center, emergency room

- August 11, 2016 – Claimant sought treatment at the emergency room for neck and back pain that she had been having for three days after lifting heavy objects. An x-ray of the spine was performed and Norco, Flexeril and Prednisone were prescribed. She was referred to Dr. Juneau for a follow-up appointment. (Rec. Doc. 6-1, pp. 757-764).
- October 11, 2016 – Claimant sought treatment at the emergency room for recurring neck and back pain. Norco, Flexeril and a Medrol dose pack were prescribed. She was referred to Dr. Kevin Lasseigne for a follow-up appointment. (Rec. Doc. 6-1, pp. 794-798).

D.  Duson Family Healthcare, Duson, Louisiana

September 22, 2016 – Claimant sought treatment for numbness in both arms. A decrease in strength in hands, difficulty in holding items in hands, difficulty raising arms, decreased range of motion, tenderness to palpation to bilateral shoulders, and pain with flexion

and extension of the neck were noted.  A CT scan was ordered, and Lisinopril and Tramadol were prescribed. (Rec. Doc. 6-1, pp. 465-479).

E.  <u>Dr. Patrick Juneau, Neurosurgeon, Lafayette, Louisiana</u>
- <u>Surgery November 25, 2016</u> – Claimant reported having recurrent neck and left arm pain over the last year and a half which became worse when she reinjured herself lifting grease at work.  She tried outpatient physical therapy and her symptoms persisted.  An MRI of the spine revealed a large, herniated disc at the C4/5 with an increased signal at the cord at that level.  Dr. Juneau performed an anterior cervical diskectomy with instrumented fusion at C4/5 with removal of prior hardware at the C5/6 level.  She was prescribed Soma for muscle spasms, and it was noted that she had already been given a script for Norco for pain. (Rec. Doc 6-1, pp. 763-782).
- <u>Follow-up office visits</u> –
  On <u>January 12, 2017</u>, Dr. Juneau referred Claimant to Robert Marshall for pain management. (Rec. Doc. 6-1, p. 865).
  On <u>November 9, 2017</u>, Dr. Juneau reviewed postoperative imaging performed that day, reported a solid interbody fusion at the C5/6 level and requested that Claimant follow-up with imaging and an appointment November 8, 2018.  (Rec. Doc. 664).

F.  <u>Our Lady of Lourdes Regional Medical Center – emergency room</u>
- <u>December 24, 2016</u> – Claimant sought treatment at the emergency room with complaints of increasing pain following surgery in November.  She reported that Dr. Juneau had discharged her and advised her to follow-up with pain management, but pain management told her that she was too fresh from surgery to qualify for pain management.  She was given Norco and prescribed Tramadol. (Rec. Doc. 6-1, pp. 829-832).

G.  <u>Lafayette General Medical Center – emergency room</u>
- <u>December 22, 2016</u> – Claimant sought treatment at the emergency room with complaints of lower abdominal pain, dysuria, right flank pain, and radiating back pain exacerbated by urination.  She noted that Dr. Juneau had performed a cervical fusion in November.  A UTI was diagnosed, and she was prescribed medications. (Rec. Doc. 6-1, pp. 947-954).
- <u>January 8, 2017</u> – Claimant sought treatment at the emergency room with complaints of increasing pain over the surgical site for the past two days following surgery three weeks prior.  She reported that her neurosurgeon had decreased her pain medication from Percocet to Hydrocodone. A CT scan was performed, Percocet and Robaxin were

prescribed, and she was advised to see Dr. Juneau in two to three days. She was then counseled that the narcotic and sedative policy at Lafayette General would prevent Claimant from receiving treatment for her pain after this visit due to the chronic nature of the pain. (Rec. Doc. 6-1, pp. 800-811).

H. Our Lady of Lourdes Regional Medical Center – emergency room
- March 20, 2017 – Claimant sought treatment at emergency room for pain in left leg after falling down a set of stairs. Her arm was placed in a sling, and she was prescribed Norco and Robaxin. (Rec. Doc. 6-1, pp. 784-791).
- October 2, 2017 – Claimant sought treatment at emergency room for pain in left leg after a fall. She was prescribed Norco, Cyclobenzaprine, and Naproxen. (Rec. Doc. 6-1, pp. 732-737).
- December 22, 2017 – Claimant sought treatment at emergency room for hematuria and pain in the right flank which moved to the bladder. She was prescribed Ciprofloxacin, Naproxen, and Zofran. (Rec. Doc. 6-1, pp. 734-742).
- October 17, 2018 – Claimant presented at emergency room after being hit in the head while sleeping. She complained of a headache that persisted after taking over the counter medications. Melanie Fitzmorris, FNP notes that Claimant respectively asked her and the RNs for narcotic pain medication prior to the CT scan and when given a Norco tablet told the nurses that she needed more than that "because I used to take Roxicodone 30mg." Fitzmorris then advised Claimant that she would not prescribe a narcotic for bruising. She was prescribed Naproxen. (Rec. Doc. 6-1, pp. 743-747). As noted below, on October 18, 2017, Claimant went to the emergency room at Lafayette General and was prescribed pain medication.

I. Urgent Care of Lafayette, Dr. Robert Marshall
- March 29, 2017 – Claimant sought pain management care after referral from Dr. Juneau. Dr. Marshall reported that Claimant's numbness in her arms had dissipated, but she still had intense pain of the left shoulder and arm which she rated without medicine as a 7. She reported that she could bathe and dress herself without medication, but only with significant pain and that she had been unable to work without medication. She also reported falling ten days ago and going to the emergency room where she was prescribed Hydrocodone. Dr. Marshall found mild pain to palpation of the medial aspect of the left knee, moderate tenderness to palpation over CS-6, C6-7 and C7-T1, radiation of numbness and tingling and sharp stabbing pain into the left arm in a C6, C7, numbness and tingling down the right arm in a C7 pattern, decreased range of motion of the

neck, moderate tenderness to palpation over L3-4 and L4-5, spasms of the lower back muscles, leg cramps, radiation of numbness and tingling into both legs in a LS radicular pattern, decreased range of motion of the back, and pain on flexion. He diagnosed her with anxiety, low back pain, knee pain, and cervical disc degeneration; prescribed Percocet for pain, Methocarbamol for muscle spasms and Paroxetine for anxiety; and requested that she make another appointment in twenty-eight days. She also signed a pain management agreement. (Rec. Doc. 6-1, pp. 613-629).

- <u>April 26, 2017</u> – Claimant returned for follow-up appointment and reported that pain was better. She rated it a 7 without medication and a 6 with medication. She also reported that she could perform her daily chores with the medication, that she had a headache, "bone pain" in her lower extremities. She scored an 8 on the PHQ-9 questionnaire indicating that she was suffering from mild depression. In addition to the issues diagnosed in March, Dr. Marshall diagnosed Claimant with major depressive disorder, single episode, and increased the strength of her Oxycodone because she was not meeting her pain management goal. He also prescribed Sertraline for her anxiety because Claimant complained that she did not like the Paroxetine. He requested that she schedule a follow-up appointment in twenty-eight days. (Rec. Doc. 6-1, pp. 611-612).

- <u>May 11, 2017</u> – Dr. Marshall filled out a Treating Physician Mental Functional Assessment Questionnaire. He checked "yes" that he was treating Claimant, but checked "no," when asked whether the mental condition imposed more than a minimal limitation. (Rec. Doc. 6-1, p. 577).

- <u>September 5, 2017</u> – Claimant was discharged from Urgent Care pain management because she stopped attending her appointments. (Rec. Doc. 6-1, p. 610).

**J.** <u>Louisiana Cardiovascular Limb and Salvage, Dr. Ragotham Patlola</u>
August 8, 2018 and August 22, 2018 appointments following nuclear imaging and stress tests of heart. (Rec. Doc. 676-712).

**K.** <u>Healthcare Dimensions LLC, Opelousas, Louisiana</u>
- <u>August 31, 2018</u> – Claimant sought treatment and was seen by Pamela Jackson, APRN-BC for an initial evaluation anxiety. She reported that her anxiety had been out of control for two months and "everything makes me nervous." She also reported frequent visits to the emergency room and extensive workups with her primary care physician, but that all her [test] results have been negative. She also reported

episodes are random but frequent, starts with dizziness,

elevated heart rate, chest pain/tightness, crying, excessive worry and unrealistic phobias about any and everything. Admits to low self-worth, Insecure about everything, was in long physically, emotionally, sexually abusive marriage. Still with fears and flashbacks despite being dead since 2010. Reports poor sleep 1-3 hours per night wakes not feeling rested. Discussed treatment options, consented to after risk vs. benefit discussed.

(Rec. Doc. 6-1, p. 726).

It is noted that Dr. Veeramachineni was her primary care physician and she had been diagnosed with anxiety and depression. APRN Jackson diagnosed her with Agoraphobia with panic disorder, and prescribed Xanax. (Rec. Doc. 6-1, pp. 729-731).

- September 14, 2018 – Claimant sought treatment for generalized anxiety disorder and panic disorder. She reported that she had a follow-up appointment with her primary care physician and that her blood pressure had gone down, but that she stopped the Xanax because of her daughter's fear of addiction. She reported that she could not control her thoughts, had a fear of people and being in public, and that she was "shaking, hides [and] can't open blinds." She also stated that she was the live-in nanny for daughter and that she cooked, cleaned, and took care of the three children. APRN Jackson prescribed Diazepam. (Rec. Doc. 6-1, pp. 727-728).

- October 12, 2018 – Claimant sought follow-up treatment for generalized anxiety disorder and panic disorder. She reported that her mood fluctuated, but that the medication takes the edge off. She also reported "increased irritability, decreased patience, low frustration tolerance, always on edge. I feel like I'm gonna lose it. I just want to run away. I need someone to talk to." She agreed to counseling and was prescribed Klonopin and Diazepam. (Rec. Doc. 6-1, pp. 724-726).

L. Lafayette General Medical Center, emergency room
- September 7, 2018 – Claimant presented at emergency room for wound care and was diagnosed with cellulitis. She was prescribed clindamycin and Norco. (Rec. Doc. 6-1, pp. 824-828).

- October 18, 2018 – Claimant presented at emergency room after being hit in the head while sleeping. She complained of a headache that persisted after taking over the counter medications and explained that she had been to another emergency room the night before where she had been diagnosed with a concussion. She was diagnosed with a head contusion and a concussion and prescribed Tramadol and Zofran. (Rec. Doc. 6-1, pp. 743-747).

- <u>April 18, 2019</u> – Claimant presented at emergency room for leg swelling and shortness of breath. She was diagnosed with bilateral extremity edema and as having a Baker cyst. (Rec. Doc. 6-1, pp. 927-932).
- <u>June 21, 2019</u> – Claimant sought treatment at emergency room for a sore throat. She was diagnosed with strep throat and prescribed medication. (Rec. Doc. 6-1, pp. 923-927).
- <u>July 3, 2019</u> – Claimant sought treatment at emergency room for constipation, rectal bleeding, and hemorrhoids. She was diagnosed with constipation and rectal prolapse and prescribed medication. (Rec. Doc. 6-1, pp. 915-919).
- <u>August 28, 2019</u> – Claimant presented at emergency room with knee pain and swelling. It is noted that on November 21, 2015, she stated that she was in recovery and requested "no narcotics," however, on October 17, 2018, she denied this. She complained of a headache that persisted after taking over the counter medications and explained that she had been to another emergency room the night before where she had been diagnosed with a concussion. She was diagnosed with a left knee sprain and prescribed Tramadol. (Rec. Doc. 6-1, pp. 911-915).

<u>M. Dr. Luis Alvarez, New Iberia, Louisiana</u>
- <u>July 16, 2019</u> – Claimant sought treatment for constipation and rectal bleeding and sought a colonoscopy. She complained of fatigue, loss of appetite, weight gain weight loss, lack of energy, sore throat, hoarseness, hair loss, heat intolerance, cold intolerance, abdominal pain and swelling, rectal bleeding and pain, constipation, nausea, hematuria, frequent urination, easy bruising, arthritis, back pain, joint pain, muscle weakness, frequent headaches, migraine, numbness or tingling, memory loss, weakness, cough, shortness of breath, and wheezing. Dr. Alvarez found constipation, generalized abdominal pain, rectal bleeding, rectal prolapse and recommended a colonoscopy. (Rec. Doc. 6-1, pp. 909-912).
- <u>August 20 and 23, 2019</u> – Colonoscopy and EGD (esophagogastroduodenoscopy) were performed, and a report was filed. Poor preparation was noted, and as a result a second colonoscopy was recommended in one year. Rectal prolapse and Grade/Stage 11 hemorrhoids were noted. (Rec. Doc. 6-1, pp. 905-906).
- <u>September 10, 2019</u> – Claimant presented to follow-up from Colonoscopy and EGD. The EGD revealed an esophageal ulcer, esophagitis, concentric rings and furrows, hiatal hernia, esophageal stricture/ring, and non-erosive gastritis. The colonoscopy revealed external hemorrhoids and rectal prolapse. Due to the severity of the

rectal prolapse, Claimant requested colorectal surgery to repair it. Dr. Alvarez stated that her medical conditions included arthritis, COPD., coronary artery disease, fibrositis/fibromyalgia, gastroesophageal reflux disease, high blood pressure, kidney stones, vascular disease and wheezing. (Rec. Doc. 6-1, p. 901-903).

- <u>January 23, 2020</u> – Claimant sought treatment for continued constipation and heartburn. A second EGD was recommended. (Rec. Doc. 6-1, pp. 870-874).

N. <u>University Medical Center Lafayette, La.</u>

- <u>September 24, 2019</u> – Claimant sought consultation to correct rectal prolapse. Dr. Michael Horaist noted her history of migraines, hypertension, obesity, abscess of the buttocks, contusion on the arm, severe rectal prolapse and external hemorrhoids. Surgery was scheduled. (Rec. Doc 6-1, pp. 884-888).
- <u>Surgery October 21, 2019</u> – Sigmoidectomy and rectopexy performed for rectal prolapse and symptoms of pelvic floor dysfunction, urinary incontinence, and chronic constipation. (Rec. Doc. 6-1, pp. 978- 980).
- <u>November 7, 2019</u> – Claimant presented for follow-up appointment following rectal surgery and reported that since returning to solid diet she experienced chronic constipation requiring manual disimpaction, urinary incontinence and deep intermittent pain in the abdomen. She was referred to a gynecologist and urologist and requested to return to the clinic in six weeks. (Rec. Doc 6-1, pp. 968-971).
- <u>December 5, 2019</u> – Claimant presented for follow-up with same complaints of constipation and incontinence. It was noted that she made appointments with a gastroenterologist on January 23, 2020, and would follow-up with a urologist and gynecologist. (Rec. Doc 6-1, pp. 1007-1010).
- <u>January 21, 2020</u> – Claimant presented for follow-up with same complaints of constipation, incontinence, cramping and reported that she was tearful because she was afraid to go in public due to incontinence. It was noted that she made appointments with a gastroenterologist on January 23, 2020, a gynecologist on January 27, 2020, and would follow-up with a urologist. (Rec. Doc 6-1, pp. 101-1013).
- <u>February 17, 2020</u> – Claimant presented for follow-up with same complaints of constipation and incontinence. It was noted that she was referred to a urologist. (Rec. Doc 6-1, pp. 1014-1017).
- <u>April 21, 2020</u> – Dr. Marco Rajo reported that he attempted to contact Claimant three times to follow-up with her and could not reach her. (Rec. Doc. 6-1, p. 1017).
- <u>November 4, 2020</u> – Claimant reported chronic constipation and

sharp abdominal pain. She also reported that she had gone to the emergency room at Lafayette General with the same pain on August 17, 2020 and was referred to a gastroenterologist and diagnosed with chronic constipation and micritic anemia. Nurse practitioner Jade Doucet referred her to an internist. (Rec. Doc. 6-1, pp. 998-1003).

- <u>July 27, 2021</u> – Claimant diagnosed with COPD with no response to bronchodilators by Dr. Rohini Vicknair, pulmonologist. (Rec. Doc. 1034-1035).
- <u>July 29, 2021 – August 6, 2021</u> – The following issues were noted: abscess of right buttock, chronic constipation, contusion of right arm, hypertension, impaired mobility, migraine, obesity, COPD. Laboratory tests revealed an iron deficiency and patient was scheduled for several infusions to treat the deficiency. (Rec. Doc. 6-1, pp. 1038-1056).

## II.    <u>State Agency Consultants</u>

On December 13, 2018, after request for reconsideration, the state agency medical consultants, Dr. Bruce Lochner and Dr. William Oehlert, determined that Claimant had severe degenerative disc disease, obesity, and anxiety and obsessive-compulsive disorders. (Rec. Doc. 6-1, pp. 66-112). The consultants found that Claimant's statements about the intensity, persistence, and functionally limiting effects of the symptoms were only partially consistent with the Claimant's statements and did not indicate the severity described. (Rec. Doc. 6-1, p. 93). They further found that Claimant's physical limitations allowed her to do light work, that her mental issues did not impact her ability to work, and that she was not disabled. (Rec. Doc. 6-1, pp. 66-112).

## III.    <u>Testimony at telephone hearing before the ALJ</u>

Claimant testified that she tried to go back to work in 2019 but had to quit because of her intestinal issues and subsequent surgery. (Rec. Doc. 6-1, p. 51). She further testified that she has continued to have significant bowel issues requiring

long stays in the restroom, and "leaks" which have resulted in significant blood loss resulting in anemia and requiring iron infusions. *Id.* She testified that she could not perform any job even a sit-down job because of her bowels which sometimes force her to stay in the bathroom for up to six hours which would not be tolerated by an employer. (Rec. Doc. 6-1, p. 53). She further testified that she had been to see her primary care physician and he had put her back on anti-depressants three weeks prior to the hearing, that she had trouble holding things, and that she stopped taking pain medication because the narcotics only dulled the pain and impacted her life negatively. (Rec. Doc. 6-1, pp. 56, 57).

The ALJ found Claimant was not disabled. Claimant now seeks reversal of the Commissioner's adverse ruling.

**Discussion**

**A.**    **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that:

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means— and means only— "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, (2019) (internal citations omitted).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir.2008) (citing *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

The United States Supreme Court defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983).  In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – unless the Commissioner applied an incorrect legal standard that materially

influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the Claimant's subjective evidence of pain and disability, and (4) the Claimant's age, education, and work experience. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

**B.      Entitlement to Benefits**

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). *See also Smith v. Berryhill*, 139 S. Ct. 1865, 1772 (2019).  Supplemental Security Income (SSI) provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).  *See also Smith v. Berryhill*, 139 S. Ct. at 1772.  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy,

regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C.    **Evaluation Process**

#### 1.  Burden of Proof

A claimant is "disabled" as defined in the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A sequential five-step inquiry is used to determine whether a claimant is disabled. The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520I.

"The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d at 461; *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

## 2. <u>Residual Functional Capacity</u>

The ALJ is responsible for determining a claimant's residual functional capacity. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)). In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. *Giles v. Astrue*, 433 F. App'x 241, 245

(5th Cir. 2011) (citing 20 C.F.R. § 404.1545). The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *Chambliss v. Massanari,* 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

D.    **The ALJ's Findings and Conclusions**

The ALJ made the following findings:

- At step one, that Claimant has not engaged in substantial gainful activity from her alleged onset date of October 8, 2016. (Rec. Doc. 6-1, p. 25). This is supported by substantial evidence in the record.

- At step two, that Claimant had the following medically determinable impairments: degenerative disc disease of the cervical spine with radiculopathy and residual effects of surgical fusion, obesity, and anemia which has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months. (20 CFR 404.1521 et seq.) The ALJ further concluded that Claimant's COPD, anxiety-related disorder, and colorectal difficulty are not severe and do not limit Claimant's ability to work. It is unclear but appears that Claimant challenges this finding to the extent that Claimant contends that her bowel issues are ongoing, documented by objective medical evidence and affect her ability to work.

- At step three, the ALJ found that Claimant has no impairment or

combination of impairments that meets or medically equals the severity of a listed impairment. Claimant does not challenge this finding.

- The ALJ found that Claimant has the residual functional capacity to perform light work except that she is limited as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: no more than occasional stooping, kneeling, crouching, crawling, balancing and climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; and no more than frequent (*i.e.,* not constant) fingering, feeling, and handling. Claimant challenges this finding.

- At step four, the ALJ found that claimant has no past relevant work. Claimant does not challenge this finding.

- At step five, the ALJ found that claimant was not disabled from October 8, 2018 through the date of the decision because there are jobs in the national economy that she can perform. Claimant challenges this finding.

In assessing the nature, severity and functional effects of Claimant's impairments, the ALJ found:

> I am not convinced that the degree of restriction is as great as has been urged. The probative nature of the objective medical evidence, along with the substantial variances between the evidence and the claimant's allegations, suggests that the claim of complete inability to work does not accurately depict the claimant's overall functionality …

(Rec. Doc. 6-1, p. 31).

The ALJ acknowledged Claimant's "remote history of multiple surgeries on the

cervical spine (to address cervical radiculopathy)" and noted:

> at the one-year follow-up of the second surgery she complained of residual pain over the left upper trapezius muscle and sometimes down the left arm, but imaging indicated that the wound was healed, and the fusion was solid. However, in December 2017 her doctor wrote that there was trace 1-2 mm anterolisthesis of C7 on T1 which was stable. (*see* **18F**, 13; **28F** 1, 5, 13).

> At the hearing the claimant testified that she has difficulty lifting and/or carrying due to arm pain and hand weakness, difficulty holding things, and difficulty doing certain household chores involving use of the hands for certain tasks. She also has some trouble using her phone. Yet clinical physical examinations in December 2016, in January, March, October and December 2017, in September, August and October 2018, in April, June, July and August 2019, and in February 2020 were within normal limits both musculoskeletally and neurologically. (**20F** 9; **22F** 6, 11, 17, 61; **23F** 9; **31F** 5, 9, 13, 20, 25, 33, 37, 39; **33F** 27).

> Upon reflection, however, and in view of the history of extensive surgical intervention required to address her cervical spine and related radiculopathy (into the left arm particularly), it does seem reasonable that the claimant would experience at least occasional problems with pain along with manipulative difficulty related to the prior nerve problem. This plausibly could also affect her ability to lift and/or carry, as well as her ability to engage in certain postural activity such as climbing, kneeling, crawling, etc. Therefore I have assigned residual functioning capacity restrictions with respect to the amount of weight she can lift and carry, the need to avoid postural activity, and the need to avoid constant use of the hands for gross and fine manipulation.

*Id.*

The ALJ also noted that Claimant had "mild normochromic/hypochromic microcytic anemia with normal red blood cell count, which is felt to be possibly early iron deficiency anemia," and "blood transfusions in order to increase ferritin serum levels," and that her "allegations of general fatigue appear consistent with such a condition." He also noted her mild obesity which "according to Social Security Ruling 19-2p, obesity (either by itself, or in combination with other impairments) may cause

or worsen functional limitations related to sitting, standing, walking, lifting and carrying." *Id.* Accordingly, the ALJ considered the effects of Claimant's obesity along with the complaints of fatigue and the aftereffects of her cervical spine problems in reducing her overall exertional capacity down to light work. *Id.*

The ALJ further found it noteworthy that Claimant testified at the hearing that she does not help care for her three grandchildren who live with her with despite there being evidence in the medical records in September 2018 that she was their live-in nanny. (Rec. Doc. 6-1, p. 32). She found the disability determination consultant's medical source statement persuasive as to the existence of fine motor limitations, but unpersuasive that Claimant was capable of a full range of light work. *Id.* She noted that the consultative examiner from the prior application identified limitations in fine motor functioning, but found Claimant was unable to climb stairs or to "perform physical tasks" without difficulty. *Id.* The ALJ found this medical source statement persuasive as to the existence of fine motor limitations but found the notation regarding difficulty performing "physical tasks" unpersuasive given its vagueness and lack of specificity and further noted that the evidence of record fails to support the complete inability to climb stairs. *Id.*

### E.    <u>Claimant's Allegations of Error</u>

Claimant asserts that the ALJ found that Claimant's complaints of fatigue credible yet failed to account for the effects of that finding in the residual functioning capacity, resulting in a lack of substantial evidence to support the ALJ's residual functioning capacity finding.

## Analysis

Claimant asserts while the ALJ found her complaints of general fatigue consistent with her anemia and possible early iron deficiency anemia and while the vocational rehabilitation expert opined that if she needed two additional breaks during the workday − each of a fifteen-minute duration − or would be off-task at least 20% or would be absent two days per month then she could not maintain substantial gainful activity, the ALJ did not place any attendance or extra break limitations in Claimant's residual functioning capacity. She further asserts that the ALJ erred in finding her complaints credible and based on a documented medical condition, yet the ALJ did not account for the effects of that fatigue in the residual functioning capacity finding and that this error is reversible because the residual functioning capacity finding is not supported by substantial evidence. (Rec. Doc. 7, p. 4).

The Commissioner asserts that substantial evidence supports the ALJ's step five decision that Claimant had the residual functioning capacity to perform other work available in significant number in the national economy because the ALJ accounted for Claimant's obesity, complaints of fatigue, and the aftereffects of her cervical problems by reducing her to some light exertion work. (Rec. Doc. 8. P. 5) (citing *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (noting that an ALJ is not bound by vocational expert testimony which is based upon evidentiary assumptions ultimately rejected by the ALJ). The Commissioner further contends that because the ALJ did not accept the restrictions (two additional 15-minute breaks during the workday, being off-task at least 20%, or being absent two days per month)

of the vocational expert, the ALJ properly declined to rely on the vocational expert's testimony based on them.  Thus, the Commissioner argues that Claimant's assertion that the ALJ did not account fatigue in her residual functioning capacity is baseless. (*Id.*)

As discussed above, despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. *Joubert v. Astrue*, 287 F. App'x 380, 382 (5th Cir. 2008).  In doing so the Court finds the following significant.

1. <u>Lack of Medical Evidence</u>

When there is no opinion evidence in the record from a medical professional regarding the claimant's ability to work and the only evidence regarding the claimant's ability to work comes from the claimant himself, the ALJ's conclusion regarding the claimant's residual functional capacity is not supported by substantial evidence. *Ripley v. Chater*, 67 F.3d at 557.  While an ALJ may choose to reject a doctor's opinions, "[s]he cannot independently decide the effects of Plaintiff's ... impairments on [her] ability to work." *Hilts v. Commissioner,* 2019 WL 477310 at *7 (W.D. La. 2019).  Consistently, "an ALJ may not – without the opinions from medical experts – derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions." *Williams v. Astrue*, 355 Fed. App'x 828, 832 n.6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d at 557)).

In this matter, the ALJ discussed and found partially persuasive the opinions of the state medical consultants from the prior 2016 application for benefits and the 2018 evaluations for the current application.  The ALJ also noted that the record contains a psychological report date Dr. Greenway on July 21, 2011, on referral from Disability Determination Services (from a prior claim), which the ALJ dismissed as remote and a Treating Physician Mental Functional Assessment Questionnaire dated May 11, 2017 by Dr. Marshall which found Claimant's mental impairments mild.

Due to the circumstances presented by the Covid-19 pandemic Claimant filed her claim in August 2018 but did not obtain a hearing until August 2021.  In that time Claimant began to experience issues with anemia which the ALJ found severe and impacting her ability to work and colorectal issues which the ALJ found not severe, but which the Claimant asserts are ongoing and related to the anemia issues.  However, there is no evidence in the record by a treating or consultative health care provider about the impact of these issues on Claimant's ability to work.  The latest medical opinion regarding the effect of Claimant's medical conditions on her ability to work is dated from 2018.  Claimant's colorectal issues began in 2019 and her anemia is documented in November of 2020.  (*See* above summary medical records).

2. Lack of In-Person Observation by ALJ

Due to the extraordinary circumstances associated with the COVID-19 Pandemic, the hearing before the ALJ was held in August 2021 by phone almost three years after Claimant filed her application for benefits.  As discussed above, Claimant requested an in-person hearing but eventually agreed to a telephone hearing on April

6, 2021. (Rec. Doc 6-1, p. 235).  While the Court is aware of the need for telephone hearings and that Claimant agreed to the telephone hearing, the Court is also aware that certain observations and assessments cannot be made over the telephone.  In this instance, Claimant asserts that she has mobility issues, issues with fatigue, and bowel issues.  The ALJ found "substantial variances between the evidence and the claimant's allegations." While it is in the province of the ALJ to determine credibility, in this instance an in-person observation of Claimant would have shed light on these discrepancies.

3. <u>Medical Records</u>

The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits. *Ripley*, 67 F.3d at 557.  If the ALJ does not satisfy his duty, his decision is not substantially justified. *Id*.  Reversal of his decision, however, is appropriate only if the applicant shows prejudice. *Id*.  The record contains ample evidence of Claimant's physical issues, and that Claimant sought treatment for physical and mental health issues, was prescribed medication for these issues, and continuously used this medication.  In addition, the record indicates health care providers who were not contacted to provide medical records.  In particular, the medical record references primary care providers including Dr. Kortum and Dr. Veeramachineni, as well as specialists including Dr. Lasseigne.  There are no medical records from these providers.

The ALJ attempted to take into account the effects of Claimant's degenerative disc disease of the cervical spine with radiculopathy and residual effects of surgical

fusion, obesity, and anemia on her ability to perform basic work-related activities. However, particularly regarding the anemia, the record does not contain evidence that the ALJ's assessment is based on anything other than her own opinion. Accordingly, on the present record, the Court finds that the ALJ's finding that Claimant has the residual functional capacity "to perform light work except she is limited as defined in 20 CFR 404.1567(b) and 416.967(b), with the following additional limitations: no more than occasional stooping, kneeling, crouching, crawling, balancing and climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; and no more than frequent (*i.e.,* not constant) fingering, feeling, and handling" is not supported by substantial evidence.

## Conclusion and Recommendation

Because the ALJ's finding regarding the Claimant's residual functional capacity is not support by substantial evidence, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to obtain one or more reports regarding the impact of Claimant's conditions, including anemia and colorectal issues, upon her ability to work, either from treating physicians or from consultative physicians, before again evaluating the severity of Claimant's conditions and her residual functional capacity. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal

Access to Justice Act (EAJA). *See Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), *Shalala v. Schaefer*, 509 U.S. 292 (1993).

\* \* \* \* \*

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[3]

Signed at Lafayette, Louisiana on this 15th day of March, 2024.

DAVID J. AYO
UNITED STATES MAGISTRATE JUDGE

---

[3] *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).